**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SHELTERZOOM CORPORATION,

                              Plaintiff,

  v.

MITJA (DMITRY) GOROSHEVSKY and
EKATERINA PANTAZ,

                              Defendants.

Case No. 19-cv-10162

**COMPLAINT**

**Jury Trial Demanded**

Plaintiff ShelterZoom Corporation ("Plaintiff" or "ShelterZoom"), by its attorneys, for its Complaint against Defendants Mitja (Dmitry) Goroshevsky ("Mr. Goroshevsky") and Ekaterina Pantaz ("Ms. Pantaz"), hereby alleges as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This is a civil action for trade secret misappropriation pursuant to 18 U.S.C. § 1836, trade secret misappropriation under New York common law, breach of contract, breach of fiduciary duty, tortious interference with contract, and fraud.

<u>**INTRODUCTION**</u>

2.      ShelterZoom is an award-winning technology company and market leader in blockchain technology.  ShelterZoom created the world's first tokenized, industry-agnostic digital contract platform to advance deal, contract and transaction management in the online space.

3.      From June 2017 until his termination effective June 27, 2019, Mr. Goroshevsky served as Chief Architect of software development for ShelterZoom.  In that capacity, Mr.

Goroshevsky had access to ShelterZoom proprietary technology, documents, source code, and other trade secrets.  In particular, Mr. Goroshevsky possessed a significant number of ShelterZoom documents, source code, and other confidential information at least in his email, Google drive, local drive, Asana account, and Trello board.  Mr. Goroshevsky also managed the ShelterZoom accounts on Google drive, Asana, and Trello which were used as resources to share proprietary and confidential documents and information among ShelterZoom developers.

4.       Unbeknownst to ShelterZoom, Mr. Goroshevsky further managed the copy of the ShelterZoom mobile application for iOS under an account registered to his own company Factor Bench SIA with the Apple App Store.

5.       Upon his termination, ShelterZoom demanded that Mr. Goroshevsky return all ShelterZoom proprietary technology, documents, source code, and other trade secrets.  Mr. Goroshevsky refused.  Mr. Goroshevsky further terminated the other ShelterZoom developers' access to the ShelterZoom accounts on Google drive, Asana, and Trello, depriving ShelterZoom and its developers of access to its own proprietary and confidential work product.

6.       Mr. Goroshevsky also took down the copy of the ShelterZoom mobile application from the Apple App Store but refused to delete or return the software, maintaining the copy of the ShelterZoom mobile application through his Factor Bench SIA account.  Because Mr. Goroshevsky maintained a copy of the ShelterZoom mobile application on his Apple App Store account, Apple policy prevented ShelterZoom from uploading and making available for customers another copy of the ShelterZoom mobile application on the Apple App Store.

7.       For two months, ShelterZoom reiterated to Mr. Goroshevsky that he needed to delete the ShelterZoom mobile application from his account, and notified Mr. Goroshevsky that his refusal was harming ShelterZoom's business and reputation.  On August 29, 2019, Mr.

Goroshevsky's counsel notified ShelterZoom that Mr. Goroshevsky had finally deleted the ShelterZoom mobile application. But by that date, ShelterZoom had already been forced to make refund payments to its customers who had been unable to download a copy of the mobile application from the Apple App Store, and expend significant resources to rebuild its mobile application to mitigate the damage to its business and reputation.

8.     From May 2018 until her resignation effective July 25, 2019, Ms. Pantaz worked as a Technical Project Manager for ShelterZoom. In that capacity, Ms. Pantaz had access to ShelterZoom proprietary technology, documents, source code, and other trade secrets. In particular, Ms. Pantaz possessed a significant number of ShelterZoom documents, source code, and other confidential information at least in her email, Google drive, and local drive. Ms. Pantaz further improperly created and stored on her personal GitHub a full copy of the ShelterZoom proprietary FAQ GitHub repository.

9.      When Ms. Pantaz ended her work as a ShelterZoom Technical Project Manager, ShelterZoom demanded that Ms. Pantaz return all ShelterZoom proprietary technology, documents, source code, and other trade secrets. Ms. Pantaz refused.

10.     Upon information and belief, Mr. Goroshevsky and Ms. Pantaz currently work at TON Labs, a company co-founded by Mr. Goroshevsky developing a blockchain platform centered on smart contracts.

## **PARTIES**

11.     Plaintiff ShelterZoom is a Delaware corporation with its principal place of business in New York, New York.

12.     Upon information and belief, Defendant Mr. Goroshevsky is an individual residing in Riga, Latvia and a citizen of the country of Israel.

13.     Upon information and belief, Defendant Ms. Pantaz is an individual residing in Leningrad, Russia and a citizen of the country of Russia.

## JURISDICTION AND VENUE

14.     This Court has original jurisdiction over the subject matter of Plaintiff ShelterZoom's claims for trade secret misappropriation under 18 U.S.C. § 1836(c).  Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over ShelterZoom's state law claims because all of ShelterZoom's claims arise out of a common nucleus of operative facts. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332 because the matter in controversy, exclusive of interests and costs, exceeds the sum of $75,000 and is between citizens of different states.  ShelterZoom is a citizen of the State of New York and both defendants are citizens of other countries.

15.     This Court has personal jurisdiction over Mr. Goroshevsky and venue is proper because a substantial part of Mr. Goroshevsky's actions or omissions giving rise to ShelterZoom's claims occurred in this District pursuant to 28 U.S.C. § 1391(b).

16.     This Court has personal jurisdiction over Ms. Pantaz and venue is proper because a substantial part of Ms. Pantaz's actions or omissions giving rise to ShelterZoom's claims occurred in this District pursuant to 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

**I.     ShelterZoom Pioneers Blockchain Applications**

17.     ShelterZoom was founded in February 2017 by Allen Alishahi and Chao Cheng-Shorland to develop a blockchain-based platform for contracts and online transactions.

18.     In November 2017, ShelterZoom delivered an industry first for real estate introducing a blockchain-based offer and acceptance online platform.  Built on Ethereum block-chain technology, the ShelterZoom platform allows the real estate industry to standardize and

4

streamline the offer process, provide enhanced security, reduce laborious paperwork, and deliver better overall user experience for realtors, buyers, and sellers while driving faster deals and better outcomes.

19.     Capitalizing on the momentum of this initial product, ShelterZoom further developed the smart contract engine powering its real estate platform, naming it the Mithra Contract.  The Mithra Contract is a tokenized, industry-agnostic digital contract platform that provides transparency, efficiency, and security.  Utility tokens power the Mithra Contract, including the ShelterZoom Mithra Coins—ERC20 tokens that help to govern transparency—and the ShelterZoom Mithra Tokens—ERC tokens that record the details of a contract in a secure, immutable format.  With the Mithra Contract, ShelterZoom planned to target other fields including supply chain, financial services, insurance, education, legal, civil, medicine, energy, resources, and other industries.

20.     In June 2018, the CIO Application, a prominent source of technology news and awards, named ShelterZoom the 2018 Company of the Year for Blockchain.

21.     In June 2018, ShelterZoom was also awarded the prestigious SIIA CODiE award for "Best Emerging Technology" of 2018 for its real estate blockchain-based platform.  Previous SIIA CODiE award winners include Google, Salesforce, The Wall Street Journal, McGraw Hill and NetSuite.

22.     In July 2018, The Blocks Awards 2018 named ShelterZoom the Runner-Up for the Blockchain Start-up for the Year.

## II.     ShelterZoom Hires DoctorMobile to Develop ShelterZoom Software

23.     In June 29, 2017, ShelterZoom entered into an agreement with Doctor Mobile LLC ("DoctorMobile" or "DocMobile") to provide developers to work on ShelterZoom's

proprietary and confidential technology.  The agreement ("DoctorMobile Service Agreement") is incorporated by reference, but not attached due to confidentiality.

24.     The DoctorMobile Service Agreement contained a clause describing the Project Services as follows:

> Consultant shall provide software development, integration and implementation services to Customer by supplying technical resources who are among Consultant's "Personnel."

25.     In signing the DoctorMobile Service Agreement, DoctorMobile expressly agreed to maintain as confidential all "Trade Secrets" (as defined in the DoctorMobile Service Agreement), and to not "disclose, transfer, use, copy, or allow access to any Trade Secrets" to any employees who had not bound themselves to respect and protect the confidentiality of the Trade Secrets.  *See* DoctorMobile Service Agreement at 5.1.

26.     In signing the DoctorMobile Service Agreement, DoctorMobile also expressly agreed that all Work Product its Personnel developed for ShelterZoom, including copyrights, patents, trade secrets, and all other intellectual property would belong "exclusively" to ShelterZoom.  *See* DoctorMobile Service Agreement at 4.1.

### III.     ShelterZoom Hires Mr. Goroshevsky as Chief Architect

27.     In July 2017, through DoctorMobile, ShelterZoom retained the services of Mr. Goroshevsky to act as the Chief Architect of software development for ShelterZoom.

28.     The parties understood and agreed that ShelterZoom hired Mr. Goroshevsky to design and develop ShelterZoom's Ethereum blockchain based offer and acceptance platform and Ethereum blockchain based industry-agnostic Mithra Contract platform.

29.     From July 2017 through June 2019, Mr. Goroshevsky was paid to design and develop ShelterZoom's Ethereum blockchain based offer and acceptance platform and Ethereum blockchain based industry-agnostic Mithra Contract platform.

30.     Because Mr. Goroshevsky was hired and compensated to design and develop ShelterZoom's Ethereum blockchain based offer and acceptance platform and Ethereum blockchain based industry-agnostic Mithra Contract platform, all of Mr. Goroshevsky's work is owned by ShelterZoom as the hiring company.

31.     On September 28, 2018, ShelterZoom filed U.S. provisional patent application 62/738,848 entitled "Blockchain-Powered Real Estate Ecosystem for Property Buying, Selling and Renting" identifying Ms. Cheng-Shorland, Mr. Alishahi, and Mr. Goroshevsky as inventors.

32.     With the understanding that his work for ShelterZoom is owned by ShelterZoom, on October 2, 2018, Mr. Goroshevsky entered into an agreement assigning his rights to all inventions disclosed in U.S. provisional patent application 62/738,848 to ShelterZoom ("Assignment Agreement").  A true and correct copy of the Assignment Agreement is attached as Exhibit B.

33.     The Assignment Agreement assigned Mr. Goroshevsky's rights as follows:

> For good and valuable consideration, receipt of which is hereby acknowledged, I, …Dmitry Goroshevsky, do hereby sell, assign and transfer unto the ShelterZoom…the entire world-wide title, interest and right, including the right of priority controlled by me… the patent application docket number P2432, which bears application serial number 62/738,848, filed 09/28/2018, and the invention and any of them therein set forth and described.

34.     Further, as the Chief Architect of ShelterZoom, Mr. Goroshevsky played a unique role at ShelterZoom.  In particular, ShelterZoom held Mr. Goroshevsky in confidence, relied on his technical expertise and knowledge, held Mr. Goroshevsky out as a representative of ShelterZoom, and expected Mr. Goroshevsky to act in the interests of ShelterZoom in relation to his role as Chief Architect.

35.     Between July 2017 through June 2019, Mr. Goroshevsky acted as ShelterZoom's agent and acted on ShelterZoom's behalf.  For example, in multiple press releases announcing

ShelterZoom products, Mr. Goroshevsky was identified as Chief Architect and was quoted as an agent of ShelterZoom.  True and correct copies of exemplary press releases are attached as Exhibits C to E.  ShelterZoom YouTube videos advertising ShelterZoom's products also specifically identified Mr. Goroshevsky as Chief Architect.  *See* "Meet ShelterZoom – The First-Ever Blockchain-based Real Estate Offer and Acceptance Platform," available at https://www.youtube.com/watch?v=zaW4xsCbSOA (last visited on October 9, 2019).

36.     As Chief Architect, ShelterZoom also directed and permitted Mr. Goroshevsky to maintain ShelterZoom accounts, logins, and passwords, including its Asana, Trello, Apple App Store, and Google App Store accounts.

## IV.     ShelterZoom Hires Ms. Pantaz to Develop Software

37.     In August 2018, through DoctorMobile, ShelterZoom retained the services of Ms. Pantaz to serve as a Technical Project Manager for ShelterZoom.

38.     DoctorMobile and Ms. Pantaz entered into a written agreement dated August 17, 2018 ("Pantaz Agreement").  The Pantaz Agreement is incorporated by reference, but not attached due to confidentiality.

39.     The Pantaz Agreement includes a "Description of Services" which defined the scope of Ms. Pantaz's services as follows:

> I have performed and agree to continue to perform for DocMobile software development and related professional services…

40.     The Pantaz Agreement further includes a "Third Party Beneficiary" clause to the benefit of ShelterZoom, which states as follows:

> I understand and acknowledge that the Services I have performed for DocMobile and which I will continue to perform for DocMoble [sic] are for the development of software which will be provided to and owned by ShelterZoom ("ShelterZoom"), a customer of DocMobile, pursuant to a contract between ShelterZoom and DocMobile.  I expressly agree that ShelterZoom is and shall be a third party beneficiary of this Agreement, entitled to enforce directly the

provisions of this agreement relating to intellectual property rights, the assignment of Inventions, and the protection of Confidential Information.

41.     The Pantaz Agreement also includes an Obligations of Confidentiality clause that reads, in part, as follows:

> I also agree not to copy, store or transmit such Confidential Information other than as required for me to perform the Services and that any transmission of such Confidential Information shall be limited to transmissions to DocMobile, or with respect to ShelterZoom information, to ShelterZoom.  Without limiting the foregoing, I agree that in no event shall I use Confidential Information in a way that I understand could be detrimental to or in conflict with the best interests of DocMobile or ShelterZoom.

42.     In signing the Pantaz Agreement, Ms. Pantaz expressly agreed to keep all ShelterZoom and DoctorMobile "Confidential Information" (as defined in Pantaz Agreement, Sec. 7) in confidence and proprietary to ShelterZoom and DoctorMobile.  *See* Pantaz Agreement at Secs. 7 and 9.

43.     In signing the Pantaz Agreement, Ms. Pantaz further expressly agreed that all Confidential Information was the sole and exclusive property of DoctorMobile or its third-party customers and that she owned no interest or title in the Confidential Information.  *See* Pantaz Agreement at Sec. 8.

44.     In signing the Pantaz Agreement, Ms. Pantaz also expressly agreed to not use ShelterZoom's Confidential Information in interference with its interests, for example, use in the business of a direct competitor.  *See* Pantaz Agreement at Sec. 9.

45.     The Pantaz Agreement includes an "Assignment of Inventions" clause that reads, in part, as follows:

> I hereby agree that I will promptly disclose or deliver, as applicable, to DocMobile and ShelterZoom, and hereby irrevocably assign to ShelterZoom all rights, including international priority rights, in and to all Inventions…I hereby assign to ShelterZoom all inventions that I develop, solely or jointly with others, during the course of my performance of the Services for DocMobile and all Inventions that I previously developed, solely or jointly with others during the

9

course of my past performance of Services for DocMobile (or any predecessor company).

46.     Section 14 of the Pantaz Agreement prohibits Ms. Pantaz, for a period of one year after termination of the agreement, from engaging in any activity or performing any services for any person or entity that is a direct competitor of ShelterZoom.

47.     In signing the Pantaz Agreement. Ms. Pantaz also expressly agreed to promptly return all copies of ShelterZoom's Confidential Information upon termination of the agreement. *See* Pantaz Agreement at Sec. 6.

48.     During her work at ShelterZoom, Ms. Pantaz managed the project and trade secrets relating to ShelterZoom's Ethereum blockchain based industry-agnostic Mithra Contract platform.

**V.      Mr. Goroshevsky Launches Scheme to Misappropriate ShelterZoom's Trade Secrets, and Defraud, Exploit, and Unlawfully Compete with ShelterZoom**

49.     Based on information uncovered by ShelterZoom following Mr. Goroshevsky's termination in June 2019, Mr. Goroshevsky launched a secret plan to defraud and exploit ShelterZoom and misappropriate ShelterZoom's trade secrets, a plan which began as early as May 2018.

50.     According to his LinkedIn profile, in May 2018, while working for ShelterZoom as its Chief Architect, Mr. Goroshevsky co-founded a company called TON Labs and began serving as TON Lab's Chief Technology Officer.  A true and correct copy of Mr. Goroshevsky's LinkedIn Profile is attached as Exhibit G.

51.     According to its website, TON Labs' "professional solutions are designed to guide developers with different backgrounds through the process of smart-contract and Tapp creation, testing, deployment, design and marketing."  A true and correct copy of the front page of the TON Labs website is attached as Exhibit H.

10

52.     Upon information and belief, in May 2018, approximately the same time Mr. Goroshevsky founded TON Labs, Mr. Goroshevsky contacted Michael Averbach, Chief Executive Officer at DoctorMobile, to sign an agreement confirming his employment with ShelterZoom through DoctorMobile.  Mr. Goroshevsky represented that he needed the agreement to secure a bank loan.

53.     Upon information and belief, Mr. Goroshevsky first provided Mr. Averbach with an agreement which Mr. Averbach understood not to include provisions relating to intellectual property assignments.  Mr. Averbach signed this agreement.  Mr. Goroshevsky then stated that he needed to back date the agreement and sent Mr. Averbach a second version of the agreement with a date of May 31, 2017, a date prior to ShelterZoom's agreement with DoctorMobile.  Mr. Goroshevsky further stated that he needed another revision and sent a third version of the agreement with a date of May 31, 2017.  Mr. Averbach does not recall signing these back dated agreements.

54.     Upon information and belief, Mr. Goroshevsky knowingly misled Mr. Averbach regarding the contents of the agreement to exploit ShelterZoom's proprietary and confidential information in his work for TON Labs, including using trade secrets relating to ShelterZoom's Ethereum blockchain based offer and acceptance platform and Ethereum blockchain based industry-agnostic Mithra Contract platform in projects for TON Labs.

55.     In September 2018, in a public Facebook post, Mr. Goroshevsky asked for developers to join his own "mega" IT project.

56.     Upon information and belief, Mr. Goroshevsky recruited four software developers that he had been managing at ShelterZoom through DoctorMobile to join Mr. Goroshevsky at TON Labs:  Anton Serkov, Vasily Selivanov, Dmitry Romanov, and Slava Belenko.

57.     ShelterZoom paid for Mr. Serkov, Mr. Belenko, and Mr. Romanov to work full-time for ShelterZoom.  ShelterZoom paid for Mr. Selivanov to work part-time.  Upon information and belief, for almost the entire fourth quarter of 2018 and first half of 2019, Mr. Goroshevsky and the four software developers used the majority of their ShelterZoom paid time to develop software for TON Labs instead of ShelterZoom.

58.     Mr. Goroshevsky and the four developers he recruited to work on the TON Labs project also had unrestricted access to ShelterZoom intellectual property, including trade secrets, proprietary information, confidential information, and source code while working on competitive projects for TON Labs.

59.     Mr. Goroshevsky also registered the ShelterZoom mobile application for the Apple and Google App Stores under his own developer's accounts instead of the ShelterZoom developer's accounts.  Upon discovering that the ShelterZoom mobile applications were registered under Mr. Goroshevsky's accounts, ShelterZoom repeatedly requested that Mr. Goroshevsky transfer the mobile applications to the ShelterZoom developer's accounts.  Although Mr. Goroshevsky stated he would, he never did.

60.     By May 2019, ShelterZoom began to suspect that Mr. Goroshevsky was not dealing with ShelterZoom in good faith.  Mr. Goroshevsky was evasive and reacted negatively when ShelterZoom brought in a new Chief Technology Officer, a job that ShelterZoom offered to Mr. Goroshevsky several times.

61.     Just prior to his termination, Mr. Goroshevsky informed ShelterZoom management that he had begun to devote most of his time to work on a new blockchain industry client, TON Labs.  Mr. Goroshevsky then tried to extract additional payments from ShelterZoom

to "buy back" his time, despite the fact that ShelterZoom was already paying Mr. Goroshevsky for his work.

**VI.    Upon Termination, Mr. Goroshevsky Continues to Misappropriate ShelterZoom's Trade Secrets**

62.    In a letter dated June 27, 2019, ShelterZoom confirmed the termination of Mr. Goroshevsky.  In the letter, ShelterZoom demanded that Mr. Goroshevsky immediately return "all work product, trade secrets, passwords, code, intellectual property, and other ShelterZoom confidential and proprietary information."

63.    Instead of returning ShelterZoom's confidential and proprietary information, once Mr. Goroshevsky had been terminated, he engaged in numerous acts to further misappropriate ShelterZoom's trade secrets and interfere with ShelterZoom's business.

64.    Mr. Goroshevsky failed to deliver other ShelterZoom materials in his possession including logins, passwords, documents, and ShelterZoom's mobile application registrations in the Apple App Store and Google App Store.

65.    Mr. Goroshevsky terminated ShelterZoom team access to the gnup.org domain, which members of the development group had been using to access Google Drive documents containing ShelterZoom's intellectual property.

66.    Mr. Goroshevsky terminated the ShelterZoom team access to communication and discussion boards that the team had been using to create, assign and track ShelterZoom project management tasks.  The boards contained ShelterZoom's intellectual property and work product.

67.    Mr. Goroshevsky caused the ShelterZoom mobile application to be taken down from the Apple App Store and Google App Store.

68.     The day after Mr. Goroshevsky was terminated, Mr. Goroshevsky joined a ShelterZoom developer call and spoke with the development team.  During the call, Mr. Goroshevsky tried to persuade the other developers to discontinue work for ShelterZoom.

69.     On July 3, 2019, ShelterZoom's counsel sent Mr. Goroshevsky a cease and desist letter, demanding the return of all ShelterZoom property and requesting written confirmation that he had not used or disclosed ShelterZoom's confidential information, trade secrets, or business activities.

70.     On July 13, 2019, Mr. Goroshevsky's counsel responded to the letter.  This July 13, 2019 letter stated that Mr. Goroshevsky, together with Ms. Pantaz, had filed a patent application related to "Templates, MiCe [Mithra Contract Editor], Inputs editor, User Rights and other systems' software architecture designs" that had been developed for ShelterZoom, and that Mr. Goroshevsky would be willing to enter "good faith" negotiations regarding the transfer of this application to ShelterZoom.  The letter otherwise failed to address the ShelterZoom confidential and proprietary information in Mr. Goroshevsky's possession and did not return any of ShelterZoom's property, including access to the ShelterZoom mobile application in the Apple App Store.

71.     Because Mr. Goroshevsky refused to return ShelterZoom's confidential and proprietary information, Mr. Goroshevsky forced ShelterZoom to push back its software development for several months while it redirected resources to redevelop the materials that Mr. Goroshevsky had misappropriated, forcing ShelterZoom to incur damage to its business and reputation.

VI.     **Mr. Goroshevsky Further Interferes With ShelterZoom's Contractual Relationship With Its Mobile Application Customers**

72.     On August 2, 2019, ShelterZoom's legal representative sent another letter again demanding that Mr. Goroshevsky immediately return ShelterZoom's confidential and proprietary information, including returning or deleting the ShelterZoom mobile application from Mr. Goroshevsky's developer account with the Apple App Store.

73.     To mitigate damage, ShelterZoom had already filed a Notice of Complaint with the Apple administration.  Apple responded that its policy would not allow the ShelterZoom mobile application to be made available in the Apple App Store until the original copy of the application in Mr. Goroshevsky's account was deleted.  Apple contacted Mr. Goroshevsky directly to delete the application.  Although Mr. Goroshevsky stated that he would, he did not.

74.     On August 8, 2019, counsel for Mr. Goroshevsky and counsel for ShelterZoom discussed the parties' disputes.  Counsel for ShelterZoom specifically asked that Mr. Goroshevsky delete the mobile application from his developer's account with the Apple App Store as a gesture of good faith.  Counsel for ShelterZoom also noted that Mr. Goroshevsky was on notice that Mr. Goroshevsky's refusal to do so was harming ShelterZoom's business and reputation given that Mr. Goroshevsky was blocking ShelterZoom's ability to make its mobile application available to customers who had already paid for it.

75.     On August 14, 2019, counsel for Mr. Goroshevsky and counsel for ShelterZoom conferred by phone.  During the call, counsel for ShelterZoom again reiterated that Mr. Goroshevsky was interfering with ShelterZoom's business by his refusal to delete the ShelterZoom mobile application from his developer's account.

76.     Given Mr. Goroshevsky's refusal to delete the ShelterZoom mobile application from his developer's account, ShelterZoom was forced to expend resources to build another version of its mobile application to mitigate the damage to its business and reputation.

77.     On August 24, 2019, after multiple requests, Apple finally approved the new version of ShelterZoom's mobile application and allowed ShelterZoom to make the mobile application available on the Apple App Store.

78.     On August 29, 2019, more than two months after Mr. Goroshevsky's termination and after Apple had already approved the rebuilt ShelterZoom mobile application, Mr. Goroshevsky's counsel notified ShelterZoom's counsel that Mr. Goroshevsky had deleted the ShelterZoom mobile application from his developer's account.

**V.     Ms. Pantaz Joins Mr. Goroshevsky's Scheme to Misappropriate ShelterZoom's Trade Secrets, and Defraud, Exploit, and Unlawfully Compete with ShelterZoom**

79.     In September 2018, Ms. Pantaz joined ShelterZoom.  Ms. Pantaz worked for Mr. Goroshevsky on ShelterZoom's Mithra Contract project, a project to develop and commercialize the patent on which Mr. Goroshevsky was an inventor and Mr. Goroshevsky had assigned to ShelterZoom.

80.     Unbeknownst to ShelterZoom, during her work for ShelterZoom, Ms. Pantaz created and improperly stored a full copy of the Mithra Contract FAQ on her personal GitHub Repository.

81.     Upon information and belief, soon after ShelterZoom terminated Mr. Goroshevsky, Mr. Goroshevsky persuaded Ms. Pantaz to resign from her work for ShelterZoom and together file a patent application on the ShelterZoom technology.

82.     Mr. Goroshevsky's counsel described the patent application as directed towards "Templates, MiCe [Mithra Contract Editor], Inputs editor, User Rights and other systems' software architecture designs."  This describes certain inventions disclosed in U.S. provisional patent application 62/738,848 which Mr. Goroshevsky assigned to ShelterZoom.

83.     Upon information and belief, the inventions, trade secrets, and/or proprietary information contained in the confidential patent application filed by Mr. Goroshevsky and Ms. Pantaz are owned by ShelterZoom at least by assignment under the Pantaz Agreement and Assignment Agreement entered into by Mr. Goroshevsky.

84.     On July 12, 2019, Ms. Pantaz submitted her resignation effective on July 25, 2019.

85.     On July 30, 2019, ShelterZoom's counsel demanded that Ms. Pantaz immediately return all ShelterZoom intellectual property and confidential information.  Ms. Pantaz refused.

### FIRST CLAIM FOR RELIEF

### (Misappropriation of Trade Secrets – Violations of 18 U.S.C. § 1836 Against Both Defendants)

86.     ShelterZoom realleges and incorporates by reference all factual allegations set forth above.

87.     At all times relevant hereto, ShelterZoom owned the trade secrets discussed above.  ShelterZoom took significant efforts to keep, and in fact kept, those trade secrets confidential, and they were not generally known to the public.  ShelterZoom derived value from those trade secrets by, among other things, developing, marketing, and selling various products and services throughout the United States and internationally.

88.     By taking ShelterZoom's trade secrets for their own use and benefit, Defendants intentionally and willfully converted ShelterZoom's trade secrets for their own economic benefit, knowing that such action would cause injury to ShelterZoom.

89.     Mr. Goroshevsky knowingly stole and/or misappropriated ShelterZoom's trade secrets when he intentionally restricted ShelterZoom's access to such trade secrets and refused to return it.

90.     Ms. Pantaz also knowingly stole and/or misappropriated ShelterZoom's trade secrets when she intentionally did not return such trade secrets.

91.     Defendants knowingly stole and/or misappropriated ShelterZoom's trade secrets and transferred those trade secrets to themselves for unauthorized and illegal use.

92.     Defendants received ShelterZoom's trade secrets knowing that they were stolen and misappropriated from ShelterZoom and, with that knowledge, used ShelterZoom's trade secrets for their own benefit.

93.     As a direct and proximate cause of Defendants' wrongful and illegal conduct, as described above, ShelterZoom has been damaged.  ShelterZoom has not yet been able to fully quantify the monetary damage Defendants have caused ShelterZoom.  However, ShelterZoom is informed and believes and, on that basis, alleges that ShelterZoom's monetary damages exceed the minimum amount required for this Court to exercise diversity jurisdiction.  ShelterZoom also seeks disgorgement of the ill-gotten profits Defendants have generated from ShelterZoom's trade secrets.

94.     Defendants' misappropriation of ShelterZoom's trade secrets was willful and malicious.  As a result of Defendants' conduct, and to deter Defendants from engaging in similar such conduct, ShelterZoom is entitled to exemplary damages in an amount to be determined pursuant to 18 U.S.C. § 183(b)(3)(C).

95.     Monetary damages cannot fully compensate ShelterZoom for the ongoing injuries Defendants are causing to ShelterZoom, and ShelterZoom is entitled to injunctive relief pursuant to 18 U.S.C. § 1836(b)(3)(A).  ShelterZoom seeks a preliminary injunction and/or permanent injunction against Defendants which: (a) prohibits Defendants from directly or indirectly utilizing ShelterZoom's confidential and proprietary information and trade secrets; (b) prohibits

Defendants from further disclosing ShelterZoom's confidential and proprietary information and trade secrets to third parties; (c) prohibits Defendants from retaining any ShelterZoom confidential and proprietary information and trade secrets they currently have in their possession; (d) compels Defendants to properly transfer ownership of ShelterZoom's confidential and proprietary information and trade secrets back to ShelterZoom; and/or (e) compels Defendants to disclose to ShelterZoom the identity of all other persons or entities to whom Defendants have disclosed ShelterZoom's confidential and proprietary information and trade secrets and/or to whom Defendants have transferred such property.

96.     Defendants' misappropriation of ShelterZoom's trade secrets was willful and malicious.  Accordingly, ShelterZoom is entitled to an award of attorney's fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

## SECOND CLAIM FOR RELIEF

### (Misappropriation of Trade Secrets – Violations Under New York Common Law Against Both Defendants)

97.     ShelterZoom realleges and incorporates by reference all factual allegations set forth above.

98.     At all times relevant hereto, ShelterZoom owned the trade secrets discussed above.  ShelterZoom took significant efforts to keep, and in fact kept, those trade secrets confidential, and they were not generally known to the public.  ShelterZoom derived value from those trade secrets by, among other things, developing, marketing, and selling various products and services throughout the United States and internationally.

99.     By taking ShelterZoom's trade secrets for their own use and benefit, Defendants intentionally and willfully converted ShelterZoom's trade secrets for their own economic benefit, knowing that such action would cause injury to ShelterZoom.

100.    Mr. Goroshevsky knowingly stole and/or misappropriated ShelterZoom's trade secrets when he intentionally restricted ShelterZoom's access to such trade secrets and refused to return it.

101.    Ms. Pantaz also knowingly stole and/or misappropriated ShelterZoom's trade secrets when she intentionally did not return such trade secrets.

102.    Defendants knowingly stole and/or misappropriated ShelterZoom's trade secrets and transferred those trade secrets to themselves for unauthorized and illegal use.

103.    Defendants received ShelterZoom's trade secrets knowing that they were stolen and misappropriated from ShelterZoom and, with that knowledge, used ShelterZoom's trade secrets for their own benefit.

104.    As a direct and proximate cause of Defendants' wrongful and illegal conduct, as described above, ShelterZoom has been damaged.  ShelterZoom has not yet been able to fully quantify the monetary damage Defendants have caused ShelterZoom.  However, ShelterZoom is informed and believes and, on that basis, alleges that ShelterZoom's monetary damages exceed the minimum amount required for this Court to exercise diversity jurisdiction.  ShelterZoom also seeks disgorgement of the ill-gotten profits Defendants have generated from ShelterZoom's trade secrets.

105.    Defendants' misappropriation of ShelterZoom's trade secrets was willful and malicious.  As a result of Defendants' conduct, and to deter Defendants from engaging in similar such conduct, ShelterZoom is entitled to exemplary damages.

106.    Monetary damages cannot fully compensate ShelterZoom for the ongoing injuries Defendants are causing to ShelterZoom, and ShelterZoom is entitled to injunctive relief. ShelterZoom seeks a preliminary injunction and/or permanent injunction against Defendants

which: (a) prohibits Defendants from directly or indirectly utilizing ShelterZoom's confidential and proprietary information and trade secrets; (b) prohibits Defendants from further disclosing ShelterZoom's confidential and proprietary information and trade secrets to third parties; (c) prohibits Defendants from retaining any ShelterZoom confidential and proprietary information and trade secrets they currently have in their possession; (d) compels Defendants to properly transfer ownership of ShelterZoom's confidential and proprietary information and trade secrets back to ShelterZoom; and/or (e) compels Defendants to disclose to ShelterZoom the identity of all other persons or entities to whom Defendants have disclosed ShelterZoom's confidential and proprietary information and trade secrets and/or to whom Defendants have transferred such property.

107.    Defendants' misappropriation of ShelterZoom's trade secrets was willful and malicious.  Accordingly, ShelterZoom is entitled to an award of attorney's fees.

### THIRD CLAIM FOR RELIEF

### (Breach of Contract Against Mr. Goroshevsky)

108.    ShelterZoom realleges and incorporates by reference all factual allegations set forth above.

109.    Mr. Goroshevsky entered into the Assignment Agreement.

110.    ShelterZoom fully performed its obligations under the Assignment Agreement.

111.    Mr. Goroshevsky breached the Assignment Agreement by failing to assign the July 2019 patent application based on an invention "set forth and described in" U.S. provisional patent application 62/738,848.

112.    As a direct and proximate cause of Mr. Goroshevsky's wrongful conduct as described above, ShelterZoom has been damaged.  Due to the clandestine nature of Mr. Goroshevsky's conduct, ShelterZoom has not yet been able to fully quantify the monetary

damage Mr. Goroshevsky has caused ShelterZoom.  ShelterZoom also seeks disgorgement of the ill-gotten profits Mr. Goroshevsky has generated from ShelterZoom's confidential and proprietary information and trade secrets.

### FOURTH CLAIM FOR RELIEF

**(Breach of Fiduciary Duty Against Mr. Goroshevsky)**

113.    ShelterZoom realleges and incorporates by reference all factual allegations set forth above.

114.    Mr. Goroshevsky and ShelterZoom enjoyed a fiduciary relationship under which Mr. Goroshevsky was under a duty to act and give advice for the benefit of ShelterZoom upon matters within the scope of his responsibility as Chief Architect at ShelterZoom.

115.    ShelterZoom reposed confidence in Mr. Goroshevsky and reasonably relied on his superior expertise and knowledge.

116.    As the Chief Architect at ShelterZoom, Mr. Goroshevsky acted as an agent of ShelterZoom and as such owed ShelterZoom fiduciary duties.

117.    Mr. Goroshevsky breached his fiduciary duties by (i) transferring, using, and exploiting ShelterZoom's confidential information; (ii) permitting the use and exploitation of ShelterZoom's confidential information by third parties; and (iii) retaining ShelterZoom's confidential information upon termination of his employment.

118.    As a direct and proximate cause of Mr. Goroshevsky's wrongful conduct as described above, ShelterZoom has been damaged.  Due to the clandestine nature of Mr. Goroshevsky's conduct, ShelterZoom has not yet been able to fully quantify the monetary damage Mr. Goroshevsky has caused ShelterZoom.  However, ShelterZoom believes and, on that basis, alleges that ShelterZoom's monetary damages exceed the minimum amount required for this Court to exercise diversity jurisdiction.  ShelterZoom also seeks disgorgement of the ill-

gotten profits Mr. Goroshevsky has generated from ShelterZoom's confidential and proprietary information and trade secrets.

## FIFTH CLAIM FOR RELIEF

### (Breach of Contract Against Ms. Pantaz)

119.     ShelterZoom realleges and incorporates by reference all factual allegations set forth above.

120.     Ms. Pantaz entered into the Pantaz Agreement on August 16, 2018.

121.     DoctorMobile fully performed its obligations under the Pantaz Agreement.

122.     Under Section 3 of the Pantaz Agreement, ShelterZoom is a third party beneficiary of the agreement and is entitled to enforce directly the provisions of the agreement relating to intellectual property rights, the assignment of inventions, and the protection of Confidential Information.

123.     Ms. Pantaz breached Sections 7, 9, and 11 of the Pantaz Agreement by (i) transferring, using, and exploiting ShelterZoom's Confidential Information; (ii) permitting the use and exploitation of ShelterZoom's Confidential Information by third parties; (iii) removing ShelterZoom's Confidential Information from shared locations; and (iv) retaining ShelterZoom's Confidential Information upon resignation.

124.     Ms. Pantaz breached Section 12 of the Pantaz Agreement by stealing and/or misappropriating ShelterZoom's trade secrets and other Confidential Information, including ShelterZoom's software code; by failing to properly transfer and assign to ShelterZoom ownership of inventions created while working for ShelterZoom; and by taking ownership ShelterZoom's property, including by filing a patent application with Mr. Goroshevsky containing ShelterZoom's Confidential Information and trade secrets.

125.    Ms. Pantaz also breached Section 14 of the Pantaz Agreement by undertaking services for TON Labs, an entity that is a competitor of ShelterZoom, both while working for ShelterZoom and within the one year period after her resignation.

126.    Ms. Pantaz breached Section 9 of the Pantaz Agreement by engaging in business activity that is adverse to the best interests of ShelterZoom, including but not limited to working for TON Labs.

127.    Ms. Pantaz breached Section 6 of the Pantaz Agreement by failing to return ShelterZoom's property upon termination of her employment.

128.    As a direct and proximate cause of Ms. Pantaz's wrongful conduct as described above, ShelterZoom has been damaged.  Due to the clandestine nature of Ms. Pantaz's conduct, ShelterZoom has not yet been able to fully quantify the monetary damage Ms. Pantaz has caused ShelterZoom.  However, ShelterZoom believes and, on that basis, alleges that ShelterZoom's monetary damages exceed the minimum amount required for this Court to exercise diversity jurisdiction.  ShelterZoom also seeks disgorgement of the ill-gotten profits Ms. Pantaz has generated from ShelterZoom's confidential and proprietary information and trade secrets.

**<u>SIXTH CLAIM FOR RELIEF</u>**

**(Tortious Interference with Contract between ShelterZoom and its Mobile Application Users Against Mr. Goroshevsky)**

129.    ShelterZoom realleges and incorporates by reference all factual allegations set forth above.

130.    ShelterZoom relies on its mobile application to conduct business with its customers.  ShelterZoom has a continuing contractual relationship with the users of its mobile application, with economic benefit flowing to ShelterZoom.

131.    As ShelterZoom's Chief Architect, Mr. Goroshevsky knew about ShelterZoom's contractual relationships with its customers for use of its mobile application.

132.    Mr. Goroshevsky intentionally and without justification prevented ShelterZoom from accessing and making available to the public its own mobile application in the Apple App Store.

133.    By taking the actions alleged above, Mr. Goroshevsky intended to and did disrupt the contractual relationship between ShelterZoom and its customers causing ShelterZoom to breach its contract with its customers.

134.    As a direct and proximate cause of Mr. Goroshevsky's wrongful conduct as described above, ShelterZoom has been damaged.  The damages include the amount of refunds paid out to customers who could not download ShelterZoom's mobile application, the cost incurred to rebuild its mobile application, and the injury to its business and reputation caused by diverting resources to rebuild its mobile application.

## SEVENTH CLAIM FOR RELIEF

### (Tortious Interference with Contract between Ms. Pantaz and DoctorMobile Against Mr. Goroshevsky)

135.    ShelterZoom realleges and incorporates by reference all factual allegations set forth above.

136.    ShelterZoom is a company whose product is exclusively online.  ShelterZoom relies on its outside software developers to draft the software code that supports its online real estate blockchain business.  ShelterZoom had a contractual relationship with Ms. Pantaz as a third party beneficiary.

137.    As ShelterZoom's Chief Architect, Mr. Goroshevsky was Ms. Pantaz's manager, worked with Ms. Pantaz, and knew about ShelterZoom's contractual relationship with her.

138.    Upon information and belief, after his termination, Mr. Goroshevsky intentionally and without justification caused Ms. Pantaz to terminate her services to DoctorMobile and ShelterZoom on July 12, 2019.

139.    Upon information and belief, after his termination, Mr. Goroshevsky intentionally and without justification caused Ms. Pantaz to breach the terms of her contract with DoctorMobile and ShelterZoom.

140.    By taking the actions alleged above, Mr. Goroshevsky intended to, and did disrupt the contractual relationship between DoctorMobile, ShelterZoom and Ms. Pantaz.

141.    As a direct and proximate cause of Mr. Goroshevsky's wrongful conduct as described above, ShelterZoom has been damaged.  Mr. Goroshevsky has illegally caused Ms. Pantaz to deprive ShelterZoom of its property and rights.  ShelterZoom has not yet been able to fully quantify the monetary damage Mr. Goroshevsky has caused ShelterZoom.  However, ShelterZoom believes and, on that basis, alleges that ShelterZoom's monetary damages exceed the minimum amount required for this Court to exercise diversity jurisdiction.

## EIGHTH CLAIM FOR RELIEF

**(Tortious Interference with Contract between Developers, DoctorMobile, and ShelterZoom Against Mr. Goroshevsky)**

142.    ShelterZoom realleges and incorporates by reference all factual allegations set forth above.

143.    ShelterZoom is a company whose product is exclusively online.  ShelterZoom relies on its outside software developers to draft the software code that supports its online real estate blockchain business.  ShelterZoom has a contractual relationship with these software developers as a third party beneficiary.

144.     As ShelterZoom's Chief Architect, Mr. Goroshevsky was the manager of software developers Slava Belenko, Dmitry Romanov, Vasily Selivanov, and Anton Serkov, who provided software development services to ShelterZoom.

145.     Upon information and belief, Mr. Goroshevsky intentionally and knowingly induced Slava Belenko, Dmitry Romanov, Vasily Selivanov, and Anton Serkov to discontinue work on the ShelterZoom project for a substantial part of 2018 and 2019 despite payment for their services by ShelterZoom.

146.     Upon information and belief, Mr. Goroshevsky wrongfully caused Slava Belenko, Dmitry Romanov, Vasily Selivanov, and Anton Serkov to discontinue work for ShelterZoom, by exerting undue economic pressure on the developers with respect to promised future employment at TON Labs.

147.     By taking the actions alleged above, Mr. Goroshevsky intended to, and did prevent Slava Belenko, Dmitry Romanov, Vasily Selivanov, and Anton Serkov from completing their contracts with DoctorMobile and ShelterZoom.

148.     As a direct and proximate cause of Mr. Goroshevsky's wrongful conduct as described above, ShelterZoom has been damaged.  Mr. Goroshevsky has illegally caused Slava Belenko, Dmitry Romanov, Vasily Selivanov, and Anton Serkov to deprive ShelterZoom of its property and rights.  ShelterZoom has not yet been able to fully quantify the monetary damage Mr. Goroshevsky has caused ShelterZoom.  However, ShelterZoom believes and, on that basis, alleges ShelterZoom's monetary damages exceed the minimum amount required for this Court to exercise diversity jurisdiction.

## NINTH CLAIM FOR RELIEF

### (Fraud Against Mr. Goroshevsky)

149.    ShelterZoom realleges and incorporates by reference all factual allegations set forth above.

150.    Mr. Goroshevsky knowingly and intentionally concealed from ShelterZoom that, during the term of his work for ShelterZoom, he created and operated other competing business ventures and developed certain competing products, in particular, TON Labs and their products.

151.    Upon information and belief, Mr. Goroshevsky used ShelterZoom's money, resources, confidential and proprietary information and trade secrets to develop the competing venture and products.

152.    Upon information and belief, Mr. Goroshevsky undertook the scheme to develop competing ventures and products, with the intent to defraud ShelterZoom and deprive ShelterZoom of ownership and protection of its confidential and proprietary information and trade secrets.

153.    ShelterZoom had no reason to know of, and in fact did not know of, Mr. Goroshevsky's fraud.  Mr. Goroshevsky took significant steps to actively conceal his fraud from ShelterZoom and made several false statements or significant omissions, including secretly filing a patent application containing ShelterZoom confidential information and trade secrets; having software developers he was managing as Chief Architect for ShelterZoom instead do work exclusively for the competitive venture while all were being paid full-time by ShelterZoom; accessing ShelterZoom's proprietary smart contract and blockchain technology and having software developers secretly develop software for the competitive venture; misleading DoctorMobile into signing an agreement with Mr. Goroshevsky in an attempt to misappropriate ShelterZoom's confidential and proprietary information and trade secrets.

154.    ShelterZoom relied on Mr. Goroshevsky and its belief that all of his actions were in good faith.  If the concealed facts had been known to ShelterZoom, ShelterZoom would have taken appropriate measures to ensure the right, title, and interest in its properties were protected from Mr. Goroshevsky's misappropriation.  Instead, because Mr. Goroshevsky concealed these facts from ShelterZoom.

155.    Upon information and belief, Mr. Goroshevsky made false statements with the intent to deceive.  As a direct and proximate cause of Mr. Goroshevsky's fraud, ShelterZoom has been damaged by reliance on his acts.  ShelterZoom has not yet been able to fully quantify the monetary damage Mr. Goroshevsky has caused ShelterZoom.  However, ShelterZoom believes and, on that basis, alleges ShelterZoom's monetary damages exceed the minimum amount required for this Court to exercise diversity jurisdiction.  ShelterZoom also seeks disgorgement of the ill-gotten profits Mr. Goroshevsky has generated from ShelterZoom's confidential and proprietary information and trade secrets.

156.    In doing the acts herein alleged, Mr. Goroshevsky is guilty of malice, oppression, and fraud and he has acted with a willful and conscious disregard for the rights of ShelterZoom, intending to subject ShelterZoom to cruel and unjust hardship by illegally depriving ShelterZoom of its money, property, and rights.  As a result of Mr. Goroshevsky's fraud, and to deter Mr. Goroshevsky from engaging in similar such conduct, ShelterZoom is entitled to punitive damages.

157.    In addition to its other remedies, ShelterZoom seeks imposition of a constructive trust over the ShelterZoom property, including confidential and proprietary information and trade secrets, that Mr. Goroshevsky now has in his possession by virtue of his fraudulent acts.

## TENTH CLAIM FOR RELIEF

### (Declaratory Relief Against Both Defendants)

158.     ShelterZoom realleges and incorporates by reference all factual allegations set forth above.

159.     While serving as Chief Architect to ShelterZoom, Mr. Goroshevsky assumed a contractual duty to ensure the ownership of inventions and trade secretes he created during the term of his employment was vested in ShelterZoom.

160.     Upon information and belief, Mr. Goroshevsky, during his employment with ShelterZoom, created TON Labs, submitted a patent application, and developed software for TON Labs while possessing ShelterZoom's proprietary and confidential information, including its confidential documents and source code.

161.     While serving as Technical Project Manager to ShelterZoom, Ms. Pantaz assumed a contractual duty, pursuant to at least the Pantaz Agreement, to ensure the ownership of inventions and trade secrets she created during the term of her employment was vested in ShelterZoom.  The scope of Ms. Pantaz's duties to transfer and assign ownership of her intellectual property to ShelterZoom is more fully outlined in Section 12 of the Pantaz Agreement.

162.     Upon information and belief, Ms. Pantaz, at the end of her employment with ShelterZoom, began working for TON Labs, submitted a patent application, and developed software for TON Labs while possessing ShelterZoom's proprietary and Confidential Information, including its confidential documents.

163.     Due to Defendants' concealment of their illegal activities, ShelterZoom has only been able to uncover a partial list of the intellectual property that Mr. Goroshevsky and Ms. Pantaz have misappropriated from ShelterZoom and exploited to their own benefit.

164.    A dispute has now arisen concerning the ownership of this intellectual property and confidential information created at ShelterZoom, and which is now in the possession and control of Mr. Goroshevsky and Ms. Pantaz.  More specifically, Defendants claim to be the owners of the work product created by Mr. Goroshevsky and Ms. Pantaz during their employment at ShelterZoom, including any patent applications, source code, documents, and other inventions and trade secrets developed as part of their employment at ShelterZoom ("Work Product").

165.    ShelterZoom asks the Court to enter an order declaring ShelterZoom to be the rightful owner of the Work Product that Mr. Goroshevsky and/or Ms. Pantaz created during their employment at ShelterZoom, including but not limited to the Work Product and property identified in the preceding Paragraph.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.    That the Court enter an order finding as follows:

a)    On Claims 1 and 2 for monetary damages against both Defendants, including disgorgement of the ill-gotten profits they generated from ShelterZoom's property, proprietary information and trade secrets;

b)    On Claims 3, 4, 6, 7, 8, and 9 for monetary damages against Mr. Goroshevsky including disgorgement of the ill-gotten profits he generated from ShelterZoom's property, proprietary information and trade secrets and injury incurred by ShelterZoom;

c)    On Claim 5, for monetary damages against Ms. Pantaz, including disgorgement of the ill-gotten profits they generated from ShelterZoom's property, proprietary information and trade secrets;

d)      For an award of punitive or exemplary damages against Mr. Goroshevsky and/or Ms. Pantaz;

e)      For specific performance of the relevant contracts, including transfer to ShelterZoom of title and ownership rights in work product that Mr. Goroshevsky and/or Ms. Pantaz created during their respective periods of employment with ShelterZoom, including but not limited to any and all patent applications;

f)      An order declaring ShelterZoom to be the rightful owner to the work product that Mr. Goroshevsky and/or Ms. Pantaz created during their respective periods of employment with ShelterZoom, including but not limited to any and all patent applications.

2.      That the Court issue a temporary, preliminary and, thereafter, permanent injunction against Defendants, and all others in active concert or participation with Defendants, enjoining and restraining them from the following on Claims 1 and 2, which: (a) prohibit Defendants from directly or indirectly utilizing ShelterZoom's property, trade secrets, or other confidential information; (b) prohibit Defendant from further disclosing ShelterZoom's trade secrets, or other confidential information to third parties; (c) prohibit Defendants from retaining any ShelterZoom property, trade secrets, or other confidential information they currently have in their possession; (d) compel Defendants to disclose to ShelterZoom the identity of all other persons or entities to whom Defendants have disclosed ShelterZoom's trade secrets and other confidential information and/or to whom Defendants have transferred ShelterZoom's property.

3.      That the Court order Defendants to pay to ShelterZoom general, special, actual and/or statutory damages, according to proof at trial.

4.      That the Court order Defendants to pay restitution of their profits from the above-described activities.

5.      That the Court order Defendants to pay to ShelterZoom both the costs of this action and the reasonable attorneys' fees incurred by ShelterZoom.

6.      That the Court order Defendants to pay to ShelterZoom punitive and exemplary damages in a sum to be ascertained at trial.

7.      That the Court order Defendants to pay to ShelterZoom interest at the legal rate.

8.      That the Court order such other and further relief as it may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

ShelterZoom hereby demands a jury trial on all claims herein.

Dated: November 1, 2019
       New York, New York

                              LATHAM & WATKINS LLP

                              By:   */s/ Clement J. Naples*

                                    Clement J. Naples
                                    885 Third Avenue
                                    New York, NY 10022
                                    Tel: (212) 906-1200
                                    clement.naples@lw.com

                                    Lisa K. Nguyen
                                       (*pro hac* to be submitted)
                                    140 Scott Drive
                                    Menlo Park, CA 95008
                                    Tel: (650) 328-4600
                                    lisa.nguyen@lw.com

                                    Jennifer L. Barry
                                       (*pro hac* to be submitted)
                                    Kamilah Alexander
                                       (*pro hac* to be submitted)
                                    12670 High Bluff Drive
                                    San Diego, CA 92130
                                    Tel: (858) 523-5400
                                    jennifer.barry@lw.com
                                    kamilah.alexander@lw.com

                                    *Attorneys for Plaintiff*
                                    *ShelterZoom Corporation*